## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILLIAM J. FRIEDMAN,
749 Stone Creek Lane,
White Sulphur Springs, WV 24986;

               Plaintiff,

     v.

GOVERNMENT OF ABU DHABI,
UNITED ARAB EMIRATES
c/o H. H. Sheikh Abdullah bin Zayed Al Nahyan,
Minister of Foreign Affairs & International
Cooperation,
Ministry of Foreign Affairs & International
Cooperation,
P.O. Box 1, Abu Dhabi, United Arab Emirates;

      and

JANATA BANK LTD.,
c/o Md. Abdus Salam Azad, 110, Motijheel
Commercial Area , Dhaka 1000, Bangladesh;

      and

SHEIKH KHALIFA BIN MOHAMED AL NEHYAN,
in his former official capacity as Minister of the
Government of Abu Dhabi Purchasing and Housing
Office (a/k/a Government of Abu Dhabi Department of
Purchasing and Housing; a/k/a Government of Abu
Dhabi Purchasing Department),
c/o H. H. Sheikh Abdullah bin Zayed Al Nahyan,
Minister of Foreign Affairs & International
Cooperation,
Ministry of Foreign Affairs & International
Cooperation,
P.O. Box 1, Abu Dhabi, United Arab Emirates;

              Defendants.

Case No. _____

**COMPLAINT**

Plaintiff William J. Friedman ("Mr. Friedman") submits this Complaint against Defendants, the Government of Abu Dhabi ("Abu Dhabi"), United Arab Emirates ("UAE"); Janata Bank Ltd. ("Janata"); and Sheikh Khalifa bin Mohamed Al Nehyan ("Khalifa") in his former official capacity as Minister of the Government of Abu Dhabi Purchasing and Housing Office ("ADPHO") (a/k/a Government of Abu Dhabi Department of Purchasing and Housing; a/k/a Government of Abu Dhabi Purchasing Department), and states and alleges as follows:

**INTRODUCTION**

1.      This case arises from Defendants' refusal to honor a debt owed to Mr. Friedman, and their decision instead to deceive Mr. Friedman and the U.S. Government.

2.      Mr. Friedman performed extraordinary advisory services on behalf of the UAE (of which Abu Dhabi is a member) by helping it to establish and secure significant political relationships that facilitated military sales agreements with the United States at a time when the country's modern defense capabilities were in their infancy.  He also performed extraordinary services on behalf of the UAE through his investment of business and financial resources to support the private sector of the country at a time when the UAE was in its nascent stage as a nation.

3.      In consideration for these valuable services, Abu Dhabi caused to be assigned to Mr. Friedman two instruments under seal, each promising the holder the payment of $2,500,000, for a total of $5,000,000.  The instruments were issued by Khalifa in his then-capacity as Minister of the ADPHO, and were guaranteed by both Abu Dhabi and Janata.

4.      Mr. Friedman undertook tremendous efforts to seek payment against the instruments, including through the assistance of U.S. diplomats and Members of Congress.

These officials made numerous communications to Defendants, requesting that they pay Mr. Friedman the amounts owed under the instruments.

5.      Rather than honor their obligation to him, Defendants repeatedly represented to these U.S. officials and to Mr. Friedman that the instruments he possesses are "fakes" and "forgeries."  These representations were made by, among others, influential members of the Al Nehyan ruling family.  Indeed, several of the most incriminating of these representations were made by Sheikh Surour bin Mohamed Al Nehyan ("Surour") (also spelled "Soroor" or "Suroor"), who is one of the most powerful and well-known individuals in Abu Dhabi.

6.      Both the UAE and the People's Republic of Bangladesh ("Bangladesh") (which owns and controls Janata) are allies of the United States.  The United States has had friendly relationships with the UAE since 1971, following its formation and independence from the United Kingdom, and has had formal diplomatic relations with the UAE since 1972.[1]  The United States has had formal diplomatic relations with Bangladesh since 1972, and the two countries cooperate closely on a range of issues.[2]

7.      Given this long history of friendly diplomatic relations, when Defendants represented that the instruments Mr. Friedman possesses are "fakes" and "forgeries," the U.S. Government was entitled to trust them.[3]  As a result, Mr. Friedman–on whose behalf multiple

---

[1] *See* https://history.state.gov/countries/united-arab-emirates; *see also* https://www.uae-embassy.org/uae-us-relations ("The United Arab Emirates and United States are close friends and strong allies.").

[2] *See* https://history.state.gov/countries/bangladesh; *see also* http://www.bdembassyusa.org/index.php?page=about-the-embassy ("The relationship with the United States of America is one of Bangladesh's most durable and important bilateral partnerships.").

[3] As recognized by Justice Stewart almost half a century ago, diplomacy requires that other nations be able to "deal with this Nation in an atmosphere of mutual trust…."  *New York Times Co. v. United States*, 403 U.S. 713, 728 (1971) (Stewart, J., concurring).  This atmosphere of

U.S. officials acted when these representations were made to them–reasonably came to believe that the instruments were forgeries and that an action against Defendants to enforce the instruments would be futile.

8.      Thus, by representing both to the U.S. Government and to Mr. Friedman that the instruments are inauthentic, Defendants intended to and did in fact deceive Mr. Friedman into not filing an action against them.

9.      Recently, Mr. Friedman discovered other instruments issued by Defendants around the same time as his instruments.  These newly discovered instruments are substantially similar to Mr. Friedman's instruments.  They contain much of the same language, as well as the same seals and signatures of Defendants.

10.     In light of the discovery of these new instruments, it became apparent to Mr. Friedman that Defendants' representations that his instruments are fraudulent were, themselves, fraudulent.

11.     Consequently, Defendants should not be allowed to reap the fruits of their fraudulent concealment against the U.S. Government and Mr. Friedman.  Mr. Friedman brings this action against Defendants, requesting payment in an amount not less than $5,000,000, plus accrued interest at a fair and reasonable rate, his attorneys' fees and costs, pre- and post-judgment interest, and any other relief this Court deems just and proper, to rectify the impact of Defendants' fraud upon Mr. Friedman.

## **PARTIES**

12.     Mr. Friedman is an individual residing in West Virginia.

---

mutual trust is even more pronounced where, as here, the nations dealing with the United States have been allies with it for a long time.

13.     Abu Dhabi is an Emirate in the UAE and a sovereign entity.

14.     Janata is a financial institution owned and controlled by Bangladesh that is duly organized and existing under the laws of Abu Dhabi and the UAE according to the UAE banking license of July 30, 1974.

15.     Khalifa, who is sued in his former official capacity as Minister of the ADPHO, is a resident of Abu Dhabi, UAE, and a member of the Al Nehyan ruling family, which is also commonly spelled "Al Nahyan."  He is the fifth son of Sheikh Muhammad bin Khalifa Al Nehyan.  Although Khalifa's father never ascended to the throne, he was regarded as the second-most powerful individual in Abu Dhabi in the 1960s after Sheikh Zayed bin Sultan Al Nehyan ("Zayed").  At all times relevant to this Complaint, Khalifa was Minister of the ADPHO and charged by the law of Abu Dhabi and the UAE with carrying out the duties, responsibilities, and decisions of the ADPHO.

## JURISDICTION AND VENUE

16.     Jurisdiction exists under 28 U.S.C. § 1330(a) and 28 U.S.C. § 1605(a)(2) because this is a nonjury civil action against foreign states as to claims for relief *in personam* with respect to which the foreign states are not entitled to immunity.

17.     Venue lies in this judicial district under 28 U.S.C. § 1391(f)(4), which provides that a civil action may be brought "in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof."  Venue also lies under 28 U.S.C. § 1391(f)(1), as a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.

## FACTUAL BACKGROUND

A.     **Mr. Friedman Performed Valuable Services For Defendants In Exchange For The Sealed Instruments**

18.     Mr. Friedman has had extensive experience providing advisory services such as guiding and facilitating introductions to high-level policymakers in the U.S. Government on behalf of the UAE, beginning in the 1970s with his position at the engineering, design and construction management firm of McGaughy, Marshall & McMillan.  As part of his experience, Mr. Friedman often leveraged his political relationships within the U.S. Government to serve as a liaison on behalf of the UAE for certain business transactions with the United States.

19.     Aware of his experience, and the United States' ability to provide critical military equipment to the UAE, Abu Dhabi approached Mr. Friedman about enlisting his assistance to help establish the requisite political relationships between the UAE and the United States for the purpose of facilitating military sales agreements between the two nations.

20.     Specifically, then-UAE Embassy official Hamad Al Madfa invited Mr. Friedman to attend meetings at the UAE Embassy in Washington, DC to discuss how the UAE could create relationships with U.S. officials in Washington, DC.  After these meetings had progressed for some time, Mr. Friedman was invited to meet with then-UAE Ambassador Ahmed Salim al Mokarrab ("Ambassador Mokarrab") to discuss further efforts toward advancing dialogues with Pentagon decisionmakers and legislators on Capitol Hill for the purpose of facilitating military sales agreements.

21.     During these meetings, Mr. Friedman agreed to advise and assist the UAE in securing audiences with, and in developing the strategy for persuading, decisionmakers at the Pentagon and with U.S. policymakers for the purpose of facilitating military sales agreements,

and Abu Dhabi agreed to provide Mr. Friedman good and valuable consideration in exchange for his services.

22.     Mr. Friedman fully performed his obligation by persuading a top U.S. Department of Defense official, on behalf of the UAE, to provide fair and serious evaluation of the country's strategic military interests and needs (in line with U.S. geopolitical interests), and to support the facilitation of military sales agreements with the UAE.  Mr. Friedman also engaged in similar communication efforts with then-U.S. Senator from Texas John Tower, who at that time was the Chairman of the Senate Armed Services Committee, as well as with other Members of that Committee.  Mr. Friedman's services in these regards were provided exclusively in Washington, DC, and involved interacting with the U.S. Government to support Abu Dhabi's defense acquisition needs.

23.     As a result of Mr. Friedman's efforts, the U.S. Government agreed to support and respond to the UAE's requests for strategic military hardware.

24.     Mr. Friedman also brought his business and financial resources to support the private sector of Abu Dhabi at the encouragement of the UAE Government that wanted to encourage the economic growth of, and thereby stabilize, the UAE, which was in its nascent stage as a nation.  Specifically, Mr. Friedman invested significant capital to establish a joint venture in the UAE with local UAE partners.  The business objective of the joint venture was to provide engineering and construction services for public infrastructure projects that the ADPHO and other UAE Government institutions had planned.

25.     Unfortunately, the joint venture met with misfortune.  The capital of the joint venture was misappropriated in the UAE.  The joint venture went bankrupt.  This caused

enormous financial hardship on Mr. Friedman, who had borrowed money to replenish capital lost in the joint venture.

26.     Mr. Friedman's commitment in supporting the UAE was extraordinary, and certain decisionmakers of the UAE recognized Mr. Friedman's extraordinary service.

27.     In consideration for his extraordinary services, Abu Dhabi caused to be delivered to Mr. Friedman at his then-residence in Alexandria, Virginia two documents: (1) a document executed under seal dated May 30, 1975 with Register Number 16 and a maturity date of June 30, 1985, promising to pay to the holder of said document the amount of $2,500,000; and (2) a document executed under seal dated May 30, 1975 with Register Number 17 and a maturity date of October 30, 1985, promising to pay to the holder of said document the amount of $2,500,000 (hereinafter and collectively, the "Sealed Instruments").  The Sealed Instruments are attached as **Exhibit 1**.

28.     The Sealed Instruments were prepared on ADPHO letterhead and bear the Abu Dhabi crest.  They were issued by Khalifa as the then-Minister of the ADPHO.  Ex. 1.

29.     Each of the Sealed Instruments promises, "irrevocably and unconditionally, without recourse, protest or notification of protest," to pay the holder of said Sealed Instrument the amount of $2,500,000 upon or after the date of maturity.  Ex. 1.

30.     Each of the Sealed Instruments states that its terms and conditions "are to be governed and construed in accordance with the documentary credit instruments as approved by the International Chamber of Commerce ('ICC') of Paris, resolution 222, last edition 1962 for Documentary Credits and in accordance with the laws of the Confederation of Switzerland and of the Canton of Geneva prevailing on the date of the issue."  Ex. 1.

31.     Under applicable Swiss law, and applicable ICC Rules on Collection recognized under applicable Swiss law, the holder of the Sealed Instruments may sue for collection in the jurisdiction of his choice, including the United States.

32.     Each of the Sealed Instruments states that it "and any interest herein may be transferred, pledged or assigned one or more times to persons or entities in aggregate, none of whom may be resident or citizen of Abu Dhabi."  They also state that all rights arising from ownership of the Sealed Instruments "are freely transferable and assignable…."  Ex. 1.

33.     Each of the Sealed Instruments states that the failure of the holder of said Sealed Instrument "to exercise any of its rights hereunder shall not constitute any approbation thereof in any instance during the relevant period."  Ex. 1.

34.     At the bottom of the first page of each of the Sealed Instruments are the seals of the ADPHO and Janata.  The seal of Janata is signed by Badrul Huda ("Mr. Huda")–then-Assistant General Manager of Janata–and M. H. Khundker, then-Officer of Janata.  Ex. 1.

35.     At the top of the second page of each of the Sealed Instruments, there is a statement wherein Abu Dhabi, as the first guarantor, and Janata, as the second guarantor, "affirm [their] IRREVOCABLE, UNCONDITIONAL and IRRETRACTABLE GUARANTEE FOR AVAL of the conditions and requirements of this instrument and payment at maturity,"[4] and confirm that the contents of the Sealed Instrument and guarantee "are in conformance with official exchange regulations of the State of Abu Dhabi and the United Arab Emirates."  Ex. 1.

36.     Immediately below the foregoing statement are the seals of the ADPHO, Khalifa, and Janata.  The seal of Khalifa is signed by Khalifa and his then-lawful attorney, Peter Victor George Newton ("Mr. Newton").  The signatures of Mr. Huda and Mr. Khundker appear below

---

[4] Capitalization in original.

the seal of Janata and next to their printed names and then-positions at Janata.  The signature of

Abdul Rahman ("Mr. Rahman")–the then-General Manager of the ADPHO–appears next to his

printed name and then-position at the ADPHO.  Ex. 1.

37.     At the bottom of the second page of each of the Sealed Instruments, there is a

statement wherein Janata "confirm[s] the validity and authenticity of the borrower's signatures,"

and states that it has pledged itself "to reconfirm that in occasion of each endorsement if

requested and required…."  Ex. 1.

38.     Immediately below the foregoing statement by Janata is the seal of Janata and the

signatures of Mr. Huda and Mr. Khundker next to their printed names and then-positions at

Janata.  Ex. 1.

39.     By affixing their seals to the Sealed Instruments, Defendants intended to, and did

in fact, attach and adopt their seals for the purpose of causing the instruments to be executed

under seal.

40.     Abu Dhabi caused to be assigned the Sealed Instruments to Mr. Friedman as good

and valuable consideration for the services he performed for Abu Dhabi.  As Mr. Friedman is

lawful assignee of the Sealed Instruments, and as the maturity dates for the Sealed Instruments

have passed, Defendants, as obligors under the Sealed Instruments, are obligated to pay, jointly

and severally, the amounts owed under the Sealed Instruments to Mr. Friedman upon demand.

41.     Despite repeated demands by Mr. Friedman, however, Defendants have refused to

perform their obligation to pay.  Instead, as discussed in greater detail in the next section,

Defendants engaged in a series of misrepresentations concerning the validity of the Sealed

Instruments designed to deceive Mr. Friedman into believing that they were invalid and, as a

result, into not taking action against Defendants.

**B.** **Defendants Fraudulently Concealed Evidence Of Their Wrong-Doing From Mr. Friedman**

42.     Since the maturity dates of the Sealed Instruments, Mr. Friedman has made

multiple efforts to collect on them from Defendants.

43.     His first attempt involved placing the Sealed Instruments for collection with the

First American Bank ("First American") in Alexandria, Virginia, per the recommendation of the

UAE Ambassador to the U.S., in 1986.

44.     While the Sealed Instruments were held by First American, Mr. Friedman

engaged James P. Horgen ("Mr. Horgen") to undertake negotiations relating to the process of

presentation and encashment.

45.     In a letter dated November 3, 1986 to the U.S. Department of State ("DOS"), Mr.

Horgen requested the DOS' assistance in facilitating payment of the Sealed Instruments.  In this

letter, Mr. Horgen mentioned that Ghanim Al Mazrui, a friend of Ambassador Mokarrab, had

examined the Sealed Instruments and remarked, "They must paid," to which Ambassador

Mokarrab agreed.  Mr. Horgen noted in this letter that Ambassador Mokarrab had lent his

support to expedite the collection efforts, but only "in a private rather than official capacity."

This letter is attached as **Exhibit 2**.

46.     In a letter dated November 14, 1986, First American provided notice to the

ADPHO of Mr. Horgen's authorization to undertake negotiations for payment on behalf of Mr.

Friedman.  This letter also informed the ADPHO that First American was holding the Sealed

Instruments on behalf of Mr. Friedman, and offered the ADPHO access to the Sealed

Instruments for examination.  This letter is attached as **Exhibit 3**.

47.     First American returned the Sealed Instruments to Mr. Friedman after holding

them for about a year.  In returning the Sealed Instruments to him, First American represented to

Mr. Friedman that Abu Dhabi had informed the bank that Abu Dhabi was not aware of the issuance of the Sealed Instruments.  First American shared with Mr. Friedman a telex dated December 6, 1986 from the Abu Dhabi Department of Finance disclaiming any knowledge of the issuance of the Sealed Instruments, which telex Defendants intended to be shared with Mr. Friedman.  This telex is attached as **Exhibit 4**.

48.     Unbeknownst to Mr. Friedman, First American at that time was illegally controlled by Abu Dhabi and the Al Nehyan family as part of the larger Bank of Credit and Commerce International ("BCCI") scandal.  Described by contemporary reports as "the biggest bank fraud scandal in history" up to that point, the BCCI scandal involved a series of fraudulent loans and deposits undertaken by BCCI through its secret control of banks across the globe, including First American, for the purpose of enriching its largest shareholders–Abu Dhabi and the Al Nehyan family.[5]

49.     Mr. Friedman had no reason to doubt First American's representation that Abu Dhabi had informed the bank that Abu Dhabi was unaware of the issuance of the Sealed Instruments.

50.     Indeed, around or about the same time as First American returned the Sealed Instruments to him, Mr. Friedman received correspondence from Abu Dhabi disclaiming the authenticity of the Sealed Instruments.

---

[5] *See* "BCCI Case May Be History's Biggest Bank Fraud Scandal: Finance: Losses from seized institution may reach $15 billion.  Some Third World central banks could collapse.," LA TIMES (Jul. 11, 1991), available at https://www.latimes.com/archives/la-xpm-1991-07-11-mn-2869-story.html; "World-Class Fraud: How B.C.C.I. Pulled It Off–A special report.; At the End of a Twisted Trail, Piggy Bank for a Favored Few," N.Y. TIMES (Aug. 12, 1991), available at https://www.nytimes.com/1991/08/12/business/world-class-fraud-bcci-pulled-it-off-special-report-end-twisted-trail-piggy-bank.html.

51.     Specifically, in a letter dated October 6, 1987 from the UAE Presidential Court to the U.S. Ambassador to the UAE, Abu Dhabi affirmatively represented to the Government of the United States that the Sealed Instruments Mr. Friedman possesses are "fakes" and "forgeries." This letter is attached as **Exhibit 5**.

52.     The October 6, 1987 letter enclosed correspondence in which Abu Dhabi represented "that this matter has been brought up to His Excellency Sheikh Khalifa Bin Mohamed Al Nahyan," who stated "that neither himself nor his department (at that time) have any connection with [the Sealed Instruments] and that his presumed signature is a forgery."  Ex. 5.

53.     Abu Dhabi also represented in this correspondence that "[t]his issue has been brought as well to Janata Bank, Abu Dhabi,…which attest[ed] in its turn the falsity and fraudulence of its presumed guarantee…."  Ex. 5.

54.     Abu Dhabi concluded this correspondence by representing, "These documents have been subject to numerous queries during the last two years from several parties and different nationalities abroad.  All these parties have been advised the falsity and fraudulence of such documents."  Ex. 5.

55.     Defendants intended the October 6, 1987 letter to be shared with Mr. Friedman, and said letter was in fact shared with Mr. Friedman.

56.     Given the significance of the representations made in the October 6, 1987 letter, including the fact that they were made not only to him but to the Government of the United States, Mr. Friedman came to believe that the Sealed Instruments likely were invalid and that bringing an action against Defendants to enforce the Sealed Instruments would be futile.

Nonetheless, he decided to take further steps to confirm Defendants' assertion that the Sealed Instruments are inauthentic.

57.     On October 14, 1987, Mr. Friedman submitted a telex to Saif Bin Ahmed Al-Hamil ("Al-Hamil")–the then-Undersecretary of the ADPHO–requesting a specimen of Khalifa's signature.  This telex is attached as **Exhibit 6**.

58.     Al-Hamil responded in a telex the next day, representing that Khalifa signed the Sealed Instruments "in his personal capacity" only, and that the ADPHO "has no responsibility whatsoever" on the Sealed Instruments.  Al-Hamil also represented that, as it is not "the legal [*sic*] concerned party," the ADPHO would not provide any further reply in this matter.  The October 15, 1987 telex from Al-Hamil is attached as **Exhibit 7**.

59.     Mr. Friedman also enlisted the assistance of then-U.S. Senator from Virginia Paul Trible ("Senator Trible").  In a letter dated October 13, 1987 to Surour, Senator Trible informed Surour that the UAE Presidential Court's October 6, 1987 letter raised "new questions" about the authenticity of the Sealed Instruments.  Accordingly, Senator Trible asked Surour to "please look into this matter."  This letter is attached as **Exhibit 8**.

60.     Surour was the then-head of the UAE Presidential Court.  He is a younger brother of Khalifa–the person who signed and issued the Sealed Instruments in his former official capacity as Minister of the ADPHO.  Surour is also a son of Sheikh Muhammad bin Khalifa Al Nehyan–the second-most powerful individual in Abu Dhabi in the 1960s after Zayed.  As a senior member of the ruling family of Abu Dhabi, Surour has held many pivotal positions in the Emirate and the UAE.  In addition to serving as the former head of the UAE Presidential Court, Surour served as a Board member of the UAE Central Bank and of the Abu Dhabi Departments of Water and Electricity, as the former UAE Minister of Justice, and as a senior member of the

Supreme Petroleum Council and Executive Council in the Abu Dhabi Investment Authority. Surour is also the developer and owner of two of the most prominent mixed-used properties in Abu Dhabi–the World Trade Center Abu Dhabi, and the Etihad Towers.

61.     Senator Trible's letter was hand delivered to Surour by then-U.S. Ambassador to the UAE David L. Mack ("Ambassador Mack"), as evidenced by a cable dated November 1987 between Ambassador Mack and Senator Trible that subsequently was shared with Mr. Friedman. Ambassador Mack urged Surour to give the matter his "fullest possible consideration, since an American citizen stood to suffer financial loss if he did not receive satisfaction" for the Sealed Instruments.  This cable is attached as **Exhibit 9**.

62.     In correspondence dated November 7, 1987, Surour responded to Senator Trible's October 13, 1987 letter.  In correspondence sent to both Senator Trible and the U.S. Embassy in Abu Dhabi, Surour represented that the Sealed Instruments "are fake, forged and fraudulent." These representations were false and fraudulent and were intended to deceive Senator Trible into foregoing further intervention on behalf of Mr. Friedman.  They were also intended to deceive Mr. Friedman into believing that the Sealed Instruments were fraudulent and to forego action to enforce them because such action would be futile.  This correspondence is attached as **Exhibit 10**.

63.     Surour represented that the matter was brought to Janata's attention, and he enclosed a copy of his correspondence with the bank.  In the enclosed correspondence, Janata represented as follows:

> With reference to the above [Sealed Instruments] we are to inform you that since last 7-8 years our Bank has been receiving such demand from many quarters both home and abroad and have always refused to entertain such demand on the ground that records of our Bank do not show that such [Sealed Instruments] were ever endorsed or warranted by our Abu Dhabi branch or any other branch.  The [Sealed Instruments] must be fake, forged and fraudulent.  Some unscrupulous

persons have been circulating such [Sealed Instruments] with malicious motive to blackmail the Bank. Our stand on the [Sealed Instruments] is further proved from the fact that since last 7-8 years such false claims have been made but nobody proceeded further after such claims were refused by the Bank on the ground stated.

We would further reiterate that our Bank would continue to refuse any demand against the [Sealed Instruments] because our Bank has no liability against the same which are ex-facie, false and fake.

Ex. 10.

64.     Defendants intended the November 7, 1987 correspondence from Surour, including the enclosed correspondence from Janata, to be shared with, and it was in fact shared with, Mr. Friedman. The representations made by Janata in the November 7, 1987 correspondence were false and fraudulent and were intended to deceive Senator Trible into foregoing further intervention on behalf of Mr. Friedman. They were also intended to deceive Mr. Friedman into believing that the Sealed Instruments were fraudulent and to forego action to enforce them because such action would be futile.

65.     Given the severity of the representations made by Surour and Janata that the Sealed Instruments were "fakes" and "forgeries," and the fact that these representations were made to the U.S. Government, Mr. Friedman reasonably believed that he could not pursue an action against Defendants on the Sealed Instruments. Instead, the only option Mr. Friedman reasonably believed he had at that point was to continue to try to persuade Defendants to honor their obligation through diplomatic means.

66.     Mr. Friedman enlisted the assistance of then-U.S. Senator from Massachusetts John F. Kerry ("Senator Kerry"). Senator Kerry in turn reached out to then-Assistant Secretary of State for Legislative Affairs J. Edward Fox ("Assistant Secretary Fox") for assistance.

67.     Assistant Secretary Fox informed Senator Kerry that Ambassador Mack had made numerous approaches to senior UAE officials on behalf of Mr. Friedman, but consistently had been informed that the Sealed Instruments are deemed fake, forged and fraudulent.

68.     Assistant Secretary Fox also informed Senator Kerry that Ali Shurafa ("Shurafa")–then-Director of the UAE Presidential Office–officially stated it was the UAE's position that this was a private commercial dispute.  Assistant Secretary Fox informed Senator Kerry that because of this, the DOS would no longer intervene on behalf of Mr. Friedman in his collection efforts.

69.     Defendants intended the representations made by Shurafa to be shared with, and they were in fact shared with, Mr. Friedman.  Shurafa's representations were intended to, and did in fact, persuade the DOS no longer to intervene on Mr. Friedman's behalf in this matter.

70.     Nonetheless, Senator Kerry attempted to elevate the matter to then-Secretary of State George P. Shultz ("Secretary Shultz") in March 1988, asking Secretary Shultz to urge Abu Dhabi to expedite payment to Mr. Friedman.  Senator Kerry informed Secretary Shultz about the multiple letters written by Members of Congress on behalf of Mr. Friedman, and advised him that, based on UAE sources, the letters had gone only as far as Surour.  As a result, Senator Kerry requested assistance from Secretary Shultz to ensure that the Crown Prince of Abu Dhabi was made aware of Mr. Friedman's collection efforts.  However, no assistance of any significance was provided.

71.     In addition, Mr. Friedman enlisted the assistance of then-U.S. Senator from Virginia John Warner, who in a letter dated April 25, 1988, tried to raise the matter with Ambassador Mokarrab.  This letter is attached as **Exhibit 11**.  However, no response to this letter was received.

72.     As the preceding paragraphs 42-71 demonstrate, Defendants' representations forced Mr. Friedman into a dead-end.  Defendants represented not only to Mr. Friedman but to the U.S. Government that the Sealed Instruments are "fakes" and "forgeries."  Because these representations were made by representatives of allied countries, the U.S. Government was entitled to, and did, trust them.  As a result, Mr. Friedman reasonably believed any action on the purportedly forged Sealed Instruments would be futile.  And by persuading the DOS to no longer intervene in the matter, and by refusing to respond to the requests made by Members of Congress on his behalf, Defendants frustrated Mr. Friedman's efforts to have Defendants fulfill their obligations through diplomatic means.  Given the foregoing, therefore, Mr. Friedman was deceived by Defendants' representations into not undertaking further efforts on the Sealed Instruments.

**C.     Defendants Continued To Fraudulently Conceal Their Wrong-Doing After Mr. Friedman Again Tried To Exercise Reasonable Diligence**

73.     In November 2004, Zayed died, prompting changes in UAE leadership that took place over the next several years.  As part of these changes, Surour began losing influence such that by approximately 2008, he no longer occupied an official position in the UAE Government.

74.     As discussed above in paragraphs 59-72, Surour had been a major roadblock to Mr. Friedman's efforts to have Defendants honor their debt, with letters from Members of Congress and other U.S. officials written on Mr. Friedman's behalf routinely ending up on Surour's desk only to be shelved by him.  Accordingly, with Surour's departure from the UAE Government, Mr. Friedman in 2009 decided to inquire once more whether Defendants would honor the Sealed Instruments, notwithstanding the misleading effect Defendants' representations had on him.

75.     To this end, Mr. Friedman hired counsel to communicate with Defendants about whether they would honor their obligation to him.

76.     In response, UAE Embassy's counsel stated in conversations and in correspondence that it needed to conduct its own investigation as to the validity and enforceability of the Sealed Instruments.  UAE Embassy's counsel also insisted that Mr. Friedman turn over records of his business activities for the purported purpose of aiding in this new investigation.  Correspondence from UAE Embassy's counsel to Mr. Friedman's counsel dated September 28, 2009 is attached as **Exhibit 12**.

77.     Defendants were in a position to determine the validity of the Sealed Instruments as they were the issuer.  Instead, UAE Embassy's counsel's insistence upon this new investigation, and its demand that Mr. Friedman submit to a fishing expedition through his business records, served no purpose other than to subject Mr. Friedman to further stonewalling.

78.     Moreover, UAE Embassy's counsel made incredible statements to Mr. Friedman and his counsel, during a meeting in which Congressional staff members were also present, about Defendants' knowledge of the Sealed Instruments, including a disclaimer of any knowledge of Surour, even though Surour is one of the most well-known members of the Al Nehyan ruling family.  Such statements were designed to further dissuade Mr. Friedman from pursuing collection efforts on the Sealed Instruments.

79.     After he refused to entertain their requests for additional documentation, UAE Embassy's counsel terminated all communication with Mr. Friedman and his counsel. Consequently, Mr. Friedman never received the results of the "investigation" allegedly conducted by UAE Embassy's counsel.

80.     In addition, around this same time, Defendants continued to represent both to Mr. Friedman and to the U.S. Government that the Sealed Instruments are inauthentic.

81.     Specifically, in a letter dated June 14, 2010 on behalf of Mr. Friedman, then-U.S. Senator from West Virginia John D. Rockefeller IV ("Senator Rockefeller") requested UAE Ambassador to the United States Yousef Al Otaiba ("Ambassador Al Otaiba") to urge his government to pay the amounts owed under the Sealed Instruments.  This letter is attached as **Exhibit 13**.

82.     After the passage of more than eight months, Ambassador Otaiba responded to Senator Rockefeller's inquiries about the Sealed Instruments in a letter dated February 28, 2011 that was subsequently shared with Mr. Friedman.  This letter is attached as **Exhibit 14**.

83.     In the February 28, 2011 letter, Ambassador Otaiba represented as follows:

Last year, Embassy counsel met with your staff to discuss their review.  During this meeting, Embassy counsel provided an in-depth briefing and raised a number of concerns relating to Mr. Friedman's legal claims and the information underlying them.  We have not received any information since then that puts the concerns to rest or answer the questions posed.

Ex. 14.

84.     Defendants intended the February 28, 2011 letter to be shared with Mr. Friedman.

85.     By representing to both Mr. Friedman and the U.S. Government that there were "a number of concerns" and "questions" preventing payment of the amounts owed under the Sealed Instruments, Ex. 14, Defendants intended to, and in fact did, further lull Mr. Friedman into believing that any civil action on the Sealed Instruments would be futile.

86.     As a result of Defendants' representations, Mr. Friedman was forced once again to rely upon his government contacts in an effort to persuade Defendants to honor their obligations to him notwithstanding the purportedly fraudulent nature of the Sealed Instruments.

87.     Notwithstanding the many demands made by both himself, numerous Members of Congress, and other officials of the U.S. Government, Defendants have refused to pay Mr. Friedman the amounts owed under the Sealed Instruments, insisting instead that the Sealed Instruments are "fakes" and "forgeries."

88.     Because Defendants' repeated representations that the Sealed Instruments are fraudulent were made not only to himself but to the U.S. Government (and thus were based on the atmosphere of mutual trust inherent in diplomatic relationships between allies), Mr. Friedman continued to believe that any action to enforce the Sealed Instruments would be futile.

**D.     Mr. Friedman Discovers Instruments Substantially Similar To The Sealed Instruments In His Possession, Revealing The Fraudulent Nature Of Defendants' Concealment Of Their Wrong-Doing**

89.     In February 2019, it was discovered that there exist ten other instruments (the "Newly Discovered Instruments") promising to pay significant amounts of money to their holders that are substantially similar to the Sealed Instruments Mr. Friedman possesses.  A copy of the Newly Discovered Instruments are attached as **Exhibit 15**.

90.     Mr. Friedman did not discover, and by reasonable diligence could not have discovered, the Newly Discovered Instruments prior to February 2019.

91.     The Newly Discovered Instruments are substantially similar to the Sealed Instruments in multiple respects.

92.     Both the Newly Discovered Instruments and the Sealed Instruments were issued by Khalifa as the then-minister of the ADPHO and bear the Abu Dhabi crest.  *Compare* Ex. 15, *with* Ex. 1.

93.     Both the Newly Discovered Instruments and the Sealed Instruments promise, "irrevocably and unconditionally, without recourse, protest or notification of protest," to pay the

holders of said instruments the amounts stated after the dates of maturity.  *Compare* Ex. 15, *with* Ex. 1.

94.     Both the Newly Discovered Instruments and the Sealed Instruments state that their terms and conditions are to be governed and construed in accordance with the documentary credit instruments as approved by the ICC for Documentary Credits and "in accordance with the laws of the Confederation of Switzerland and of the Canton of Geneva prevailing on the date of the issue."  *Compare* Ex. 15, *with* Ex. 1.

95.     Both the Newly Discovered Instruments and the Sealed Instruments state that they "and any interest herein may be transferred, pledged or assigned," and that they "are freely transferable and assignable…."  *Compare* Ex. 15, *with* Ex. 1.

96.     Both the Newly Discovered Instruments and the Sealed Instruments state that the failure of the holders of said instruments "to exercise any of its rights hereunder shall not constitute any approbation thereof in any instance during the relevant period."  *Compare* Ex. 15, *with* Ex. 1.

97.     At the bottom of the first page of both the Newly Discovered Instruments and the Sealed Instruments are the seals of the ADPHO and Janata.  The seal of Janata is signed by Mr. Huda and Mr. Khundker on both sets of instruments.  *Compare* Ex. 15, *with* Ex. 1.

98.     On the second page of both the Newly Discovered Instruments and the Sealed Instruments, there are guarantees by Abu Dhabi, as first guarantor, and Janata, as second guarantor.  *Compare* Ex. 15, *with* Ex. 1.

99.     Under the first paragraph on the second page in both the Newly Discovered Instruments and the Sealed Instruments, there are the seals of the ADPHO, Khalifa, and Janata.

In addition, there are the signatures of Mr. Newton, Mr. Huda, Mr. Khundker, and Mr. Rahman. *Compare* Ex. 15, *with* Ex. 1.

100.     Under the second paragraph on the second page in both the Newly Discovered Instruments and the Sealed Instruments, there are the seal of Janata and the signatures of Mr. Huda and Mr. Khundker.  *Compare* Ex. 15, *with* Ex. 1.

101.     Given that Defendants had issued the substantially similar Newly Discovered Instruments at around the same time as the Sealed Instruments, it became apparent to Mr. Friedman that Defendants' ongoing representations that the Sealed Instruments are fraudulent were, themselves, fraudulent.

102.     Defendants' representations that the Sealed Instruments are "fakes" and "forgeries" were made with the intention of fraudulently concealing their wrong-doing from Mr. Friedman and to lull him into not filing suit against them sooner.

103.     All conditions precedent to the bringing of this action have been either performed, waived, or excused.

## COUNT I–BREACH OF CONTRACT–ALL DEFENDANTS

104.     Mr. Friedman realleges paragraphs 1 through 103 of his Complaint as if fully set forth herein.

105.     At all relevant times, a valid contract existed between Mr. Friedman, as lawful assignee of the Sealed Instruments, and Defendants.

106.     Defendants materially breached that contract by, among other things, failing to pay the amounts due under the Sealed Instruments to Mr. Friedman.

107.     As a result of the aforementioned breaches, Mr. Friedman has suffered damages, including, but not limited to, the monies due under the Sealed Instruments.

108.     Mr. Friedman is entitled to recover damages in an amount not less than $5,000,000, plus interest at a fair and reasonable rate, as a result of Defendants' material breaches of contract.

## COUNT II–*QUANTUM MERUIT* (CONTRACT IMPLIED-IN-FACT)–ABU DHABI

109.     Mr. Friedman realleges paragraphs 1 through 108 of his Complaint as if fully set forth herein.

110.     Mr. Friedman provided valuable services to Abu Dhabi by performing extraordinary advisory services on behalf of the UAE, of which Abu Dhabi is a member. Specifically, Mr. Friedman engaged in a communication campaign with U.S. Government officials on behalf of the UAE to ensure the fair and serious evaluation of the country's interests, needs and concerns as they relate to the facilitation of military sales agreements with the United States.  Mr. Friedman also provided valuable services to Abu Dhabi by bringing his business and financial resources to support the private sector of Abu Dhabi at the encouragement of the UAE Government.

111.     Abu Dhabi accepted and enjoyed the valuable services rendered by Mr. Friedman under circumstances which reasonably notified Abu Dhabi that Mr. Friedman, in performing extraordinary services on behalf of the Emirate, expected to be paid.

112.     Abu Dhabi has not made any payment to Mr. Friedman for the valuable services he provided to the Emirate.

113.     Mr. Friedman is entitled to recover damages in *quantum meruit* in an amount not less than $5,000,000, plus interest at a fair and reasonable rate, as a result of Abu Dhabi's failure to pay for the valuable services he rendered to it.

## COUNT III–UNJUST ENRICHMENT (QUASI-CONTRACT)–ABU DHABI

114.     Mr. Friedman realleges paragraphs 1 through 113 of his Complaint as if fully set forth herein.

115.     Mr. Friedman conferred a benefit upon Abu Dhabi by performing extraordinary services on behalf of the UAE, of which Abu Dhabi is a member.  Mr. Friedman's services ensured the fair and serious evaluation by U.S. Government officials of the UAE's strategic interests, needs and concerns as they relate to the facilitation of military sales agreements with the United States.  Mr. Friedman also conferred a benefit upon Abu Dhabi by bringing his business and financial resources to support the private sector of Abu Dhabi at the encouragement of the UAE Government.

116.     Abu Dhabi retained the benefits conferred upon it by Mr. Friedman under circumstances that render its retention of the benefits unjust.

117.     Mr. Friedman is entitled to recover restitution in an amount not less than $5,000,000, plus interest at a fair and reasonable rate, as a result of Abu Dhabi's unjust retention of the benefits conferred upon it by Mr. Friedman.

## PRAYER FOR RELIEF

Plaintiff William J. Friedman respectfully requests that this Court enter a Judgment:

A.     In his favor and against Defendants jointly and severally for money damages under Count I in an amount not less than $5,000,000, plus accrued interest from the date of maturity of the Sealed Instruments at a fair and reasonable rate to be determined;

B.     In the alternative, in his favor and against Abu Dhabi for money damages under Count II in an amount not less than $5,000,000, plus accrued interest from the date of maturity of the Sealed Instruments at a fair and reasonable rate to be determined;

    C.      In the alternative, in his favor and against Abu Dhabi for restitution under Count III in an amount not less than $5,000,000, plus accrued interest from the date of maturity of the Sealed Instruments at a fair and reasonable rate to be determined;

    D.      His attorneys' fees and costs;

    E.      Pre-judgment and post-judgment interest; and

    F.      Any other relief, legal or equitable, that the Court deems just and proper.

Respectfully submitted,

John W. Chierichella
John W. Chierichella
(D.C. Bar No. 217356)
jchierichella@sheppardmullin.com
Hwan Kim
(D.C. Bar No. 463623)
hkim@sheppardmullin.com
Adam A. Bartolanzo
(D.C. Bar No. 997621)
abartolanzo@sheppardmullin.com

SHEPPARD MULLIN RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, DC 20006-6801
Telephone: (202) 747-1903
Facsimile: (202) 747-3801

Dated: July 8, 2019        *Attorneys for William J. Friedman*