## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**WILLIAM J. FRIEDMAN,**

  **Plaintiff,**

   **v.**

**GOVERNMENT OF ABU DHABI,**
**UNITED ARAB EMIRATES, et al.,**

  **Defendants.**

**Civil No. 19-2021 (JDB)**

## MEMORANDUM OPINION

Plaintiff William J. Friedman brought this action against the Government of Abu Dhabi, Sheikh Khalifa bin Mohamed al Nehyan in his former official capacity as Minister of the Government of Abu Dhabi Purchasing and Housing Office (collectively, the "Abu Dhabi defendants"), and Janata Bank, Ltd., seeking to recover damages for defendants' alleged failure to honor a debt owed to him. Several motions are now pending before the Court: first, the Abu Dhabi defendants' timely motion to dismiss; second, Friedman's motion for default judgment against Janata Bank, which began participating in the litigation late, following an entry of default against it by the Clerk of Court; and third, Janata Bank's motion to set aside the entry of default, filed in conjunction with a proposed motion to dismiss. For the reasons stated below, the Court concludes that it lacks subject matter jurisdiction over most of Friedman's claims and that the rest are barred by the applicable statute of limitations.

## Background[1]

Many of the facts in this case, particularly the timing of events, are something of a mystery. From what the Court can glean from the complaint, the case stems back to when, at an unspecified time but presumably before 1985, the government of the United Arab Emirates (of which Abu Dhabi is a constituent part) approached Friedman and asked him to "help establish the requisite political relationships between the UAE and the United States for the purpose of facilitating military sales agreements between the two nations." Compl. [ECF No. 1] ¶ 19. At the time, Friedman was an advisor with "extensive experience providing advisory services such as guiding and facilitating introductions to high-level policymakers in the U.S. government." Id. ¶ 18. Following the initial approach by UAE, Friedman participated in several meetings in Washington, DC, to discuss UAE's relationship with the United States and how Friedman could help "advanc[e] dialogues with Pentagon decisionmakers and legislators on Capital Hill." Id. ¶ 20. During one or more of these meetings, Friedman agreed to advise UAE, and UAE "agreed to provide Mr. Friedman good and valuable consideration in exchange for his services." Id. ¶ 21.

According to the complaint, Friedman made good on his obligations to UAE by persuading a top Defense Department official, as well as U.S. Senator John Tower, "to provide fair and serious evaluation of [UAE's] strategic military interests." Id. ¶ 22. Because of Friedman's efforts, the U.S. government considered UAE's "requests for strategic military hardware." Id. ¶ 23. Friedman provided further services to UAE (again at an unspecified time) by bringing his "business and financial resources" to bear to help UAE "encourage the economic growth of, and thereby stabilize," the country, which was then "in its nascent stage as a nation." Id. ¶ 24. Specifically, Friedman "invested significant capital" in a joint venture with UAE designed to "provide

---

[1] The relevant facts are drawn from Friedman's complaint and are assumed to be true for purposes of the motion to dismiss.

engineering and construction services for public infrastructure projects" planned by UAE.  Id.  The joint venture was unsuccessful and went bankrupt.  Id. ¶ 25.

To repay Friedman for his "extraordinary services" to UAE, at some point "Abu Dhabi caused to be delivered to Mr. Friedman at his then-residence in Alexandria, Virginia," two documents executed under seal.  Id. ¶ 27.  Both documents were dated May 30, 1975, with maturity dates in 1985.  Id.  The documents, which branded themselves as "promissory note[s]," each stated that, at maturity, the "identified holder" would be paid $2,500,000.  Exhibit 1 to Compl. ("Promissory Notes") [ECF No. 1-5] at 2, 4.  The notes themselves did not identify a holder.  The notes had several other features: (1) they could be "transferred, pledged, or assigned one or more times"; (2) they were to be governed by the laws of the "International Chamber of Commerce of Paris, resolution 222, last edition 1962," as well as Swiss and Canton of Geneva law prevailing in 1975; and (3) apparently before payment, "all the signatures must be authenticated by a bank."  Id. The notes, on their face, purported to be issued by Abu Dhabi and Khalifa and bore the seals of a number of Abu Dhabi officials.  See id. at 2–4.  Abu Dhabi was the "first guarantor" of the notes, and Janata Bank was the "second guarantor."  Id. at 3, 5.

Since the maturity dates of the promissory notes in 1985, Friedman has made a number of attempts to collect the $5,000,000 that he claims is owed to him.  His first attempt involved placing the notes for collection at First American Bank in Virginia; this attempt ended in failure when Abu Dhabi officials "disclaim[ed] any knowledge of the issuance of the [promissory notes]."  Compl. ¶¶ 43–50.  The bank subsequently returned the notes to Friedman.  Id.  Some time thereafter, Friedman became aware of an October 6, 1987 letter from the UAE Presidential Court to the U.S. Ambassador to UAE, in which UAE represented that neither Khalifa nor Janata Bank had "any connection with these notes" and that the notes were false and fraudulent.  Id. ¶¶ 51–52; Exhibit 5

3

to Compl. [ECF No. 1-9] at 3.  This letter led Friedman to "believe that the [promissory notes] likely were invalid."  Compl. ¶ 56.

Nonetheless, Friedman opted "to take further steps to confirm [the] assertion that the [promissory notes] are inauthentic."  Id.  Between 1987 and 2010, he enlisted the help of no less than three U.S. senators to attempt to recover on the promissory notes: in 1987, Senator Paul Trible; in 1988, Senator John Kerry; and in 2010, Senator John D. Rockefeller IV.  Id. ¶¶ 59, 66–70, 81.  Each senator attempted to assist Friedman by using political and diplomatic channels to reach out to UAE; each time, UAE responded that the notes were "fake, forged, and fraudulent."  Id. ¶¶ 62, 67, 82–85.  Throughout this period, and until February 2019, Friedman believed "that any [court] action to enforce the [promissory notes] would be futile."  Id. ¶ 88.

In February 2019, Friedman discovered that ten other promissory notes existed that are "substantially similar" to those in his possession.  Id. ¶ 89.  This discovery led Friedman to believe that his promissory notes are valid, and that Abu Dhabi's consistent "representations that the [promissory notes] are 'fake' and 'forgeries' were made with the intention of fraudulently concealing [its] wrong-doing from Mr. Friedman and to lull him into not filing suit . . . sooner."  Id. ¶ 102.

Friedman then decided to bring this action, which he filed on July 8, 2019.  His complaint asserts three counts: (1) breach of contract, against all defendants; (2) quantum meruit, against the Government of Abu Dhabi; and (3) unjust enrichment, against the Government of Abu Dhabi.  Id. ¶¶ 104–17.  The Abu Dhabi defendants timely moved to dismiss.  See Defendants the Government of Abu Dhabi, United Arab Emirates' Mot. to Dismiss Pl.'s Compl. ("Abu Dhabi MTD") [ECF No. 23].  Janata Bank, however, failed to timely file an answer or motion to dismiss as required by the Federal Rules of Civil Procedure.  Instead, it sent two letters to the Court indicating that it

had not been properly served under Bangladeshi law.  See Letter [ECF No. 15]; Letter [ECF No. 22].

On January 10, 2020, Friedman filed simultaneously a declaration requesting the Clerk of Court to enter a default against Janata Bank and a motion for default judgment.  See Decl. in Supp. of Entry of Default Against Janata Bank [ECF No. 25]; Pl.'s Mot. for Default J. Against Janata Bank & Statement of P. & A. in Supp. Thereof ("Default Mot.") [ECF No. 26].  Three days later, the Clerk of Court entered a default against Janata Bank.  See Default [ECF No. 28].  Upon entry of default, counsel for Janata Bank entered an appearance and began actively participating in the litigation.  Then, following the Court's grant of an extension of time to file the relevant briefs, Janata Bank moved to set aside the entry of default and filed a proposed motion to dismiss.  See Def. Janata Bank Ltd. Mot. to Set Aside Entry of Default ("Janata Mot. to Set Aside") [ECF No. 34]; Def. Janata Bank Ltd. Mot. to Dismiss Compl. ("Janata Proposed MTD") [ECF No. 35].

There are, therefore, three pending motions before the Court: (1) the Abu Dhabi defendants' motion to dismiss; (2) Friedman's motion for default judgment against Janata Bank; and (3) Janata Bank's motion to set aside the entry of default.  All three motions are now fully briefed and ripe for decision.

## Discussion

### I.    The Foreign Sovereign Immunities Act

Analysis of this case begins, and in part ends, with the Foreign Sovereign Immunities Act ("FSIA").  The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts."  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989); see also Orange Middle East & Africa v. Republic of Equatorial Guinea, 2016 WL 2894857, at *2 (D.D.C. May 18, 2016) ("FSIA is the source of jurisdiction in federal court over claims against

foreign states, their agencies, or their instrumentalities."). Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts," and "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); see also 28 U.S.C. §§ 1604–05. The FSIA's enumerated exceptions are exhaustive: "if no exception applies, the district court has no jurisdiction." Odhiambo v. Republic of Kenya, 764 F.3d 31, 34 (D.C. Cir. 2014). And if a court lacks subject-matter jurisdiction, "the court must dismiss the action." Fed. R. Civ. P. 12(h)(3) (emphasis added); see Kontrick v. Ryan, 540 U.S. 443, 455 (2004).

Defendants here all argue that the FSIA immunizes them from Friedman's suit. The Abu Dhabi defendants do so in the context of their Fed. R. Civ. P. 12(b)(1) motion to dismiss, while Janata Bank does so in the context of its motion to set aside the entry of default and its opposition to Friedman's motion for default judgment. (Janata Bank's proposed motion to dismiss raises similar arguments under Rule 12(b)(1).) The somewhat different procedural postures of the Abu Dhabi defendants and Janata Bank, however, makes no real difference to this Court's initial subject-matter jurisdiction inquiry, because "[s]overeign immunity under the FSIA is . . . a gateway issue, not simply a plea in defense to a claim: if the foreign state is entitled to immunity with respect to the claim asserted, then the district court lacks both subject matter and personal jurisdiction, and must dismiss the case." Practical Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1544–45 (D.C. Cir. 1987). In an FSIA case, whether on a defendant's motion to dismiss or a plaintiff's motion for default judgment, the plaintiff "bears an initial burden of production to show an exception to immunity . . . applies"; then, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply." Owens v. Republic of Sudan, 864 F.3d 751, 784 (D.C. Cir. 2017) (quotation omitted); see Odhiambo v. Republic of Kenya, 930 F. Supp. 2d

17, 23 (D.D.C. 2013), aff'd 764 F.3d 31 (D.C. Cir. 2014) ("Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence."); 28 U.S.C. § 1608(e) ("No judgment of default shall be entered . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court.").   On a motion for default judgment, even if a defendant never appears (which is not the situation here), the court must still satisfy itself that the plaintiff has demonstrated that an FSIA exception applies; if the plaintiff has not done so, the action must be dismissed.  See Strange v. Islamic Republic of Iran, 320 F. Supp. 3d 92, 99 (D.D.C. 2018).

The Court, therefore, proceeds to analyze whether plaintiff has established that the Court has subject-matter jurisdiction over any of his claims.

### A.  Applicability of the FSIA's Protections to Each of the Defendants

There is an initial question whether each of the defendants here is entitled to invoke the FSIA's protections.  By its terms, the FSIA immunizes "foreign state[s]" from the jurisdiction of U.S. courts.  28 U.S.C. § 1604.  "Foreign state" is defined to include "an agency or instrumentality of a foreign state."  Id. § 1603(a).  An entity qualifies as an agency or instrumentality of a foreign state if that entity is (1) a separate legal person; (2) an organ of a foreign state or its shares are majority-owned by a foreign state; and (3) neither a citizen of the United States nor "created under the laws of any third country."  Id. § 1603(b).  Moreover, "[i]ndividuals acting in their official capacities are considered 'agenc[ies] or instrumentalit[ies] of a foreign state;' these same individuals, however, are not entitled to immunity under the FSIA for acts that are not committed in an official capacity."  Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1027 (D.C. Cir. 1997).

Friedman does not contest that defendants here are "foreign states" within the meaning of the FSIA, nor could he.  Abu Dhabi is plainly a foreign state to which the FSIA applies.  See Compl. ¶ 13 ("Abu Dhabi is an Emirate in the UAE and a sovereign entity.").  Likewise, Janata Bank is plainly an agency or instrumentality of Bangladesh.  See id. ¶ 14 ("Janata is a financial institution owned and controlled by Bangladesh . . . ."); Janata Proposed MTD at 11 ("Janata qualifies for immunity under the FSIA because it is undisputed that it is an 'agency or instrumentality' of Bangladesh."); see also Lalalis Trading PTE, Ltd. v. Janata Bank, 52 A.D.3d 439, 439–40 (N.Y. App. Div. 2008) (concluding that Janata Bank is protected by the FSIA).  As for Khalifa, he is being sued "in his former official capacity as Minister of the Government of Abu Dhabi Purchasing and Housing Office."  Compl. at 2.  And it is clear from the allegations in the complaint that he is being sued solely for actions taken in his official capacity.  See id. ¶¶ 15, 28, 52, 60, 92.  For instance, the complaint alleges that Khalifa "signed and issued the [promissory notes] in his former official capacity as Minister of the [Abu Dhabi Purchasing and Housing Office]."  Id. ¶ 60.  Friedman makes no allegation that Khalifa's actions were personal in nature, and indeed the complaint states that Khalifa was acting to "carry[] out the duties, responsibilities, and decisions" of his office under the "law of Abu Dhabi and the UAE."  Id. ¶ 15.  Hence, Khalifa qualifies as an agency or instrumentality of Abu Dhabi.

All three defendants are thus "foreign states" as defined by the FSIA and are entitled to a "presumption of immunity."  Owens, 864 F.3d at 784.

### B.  The Commercial Activity Exception

To overcome that presumption of immunity, Friedman relies on the FSIA's commercial activity exception.  Under that exception, a foreign state is not immune from suit when "the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2]

upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Friedman invokes clause three for his breach of contract claim and clause one for his equitable claims. The Court addresses these invocations in turn.

### a. Breach of Contract Claim Against All Defendants

In essence, Friedman's breach of contract claim is that defendants issued and guaranteed the promissory notes but failed to pay the amounts owed when Friedman, the holder of the notes at maturity, attempted to collect. See Default Mot. at 19–20. For clause three of the commercial activity exception to apply to this claim, Friedman must establish that the claim is (1) based upon an act outside the territory of the United States, (2) taken in connection with a commercial activity of the foreign state outside this country, that (3) caused a direct effect in the United States. Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992). It is uncontested that Friedman's allegations satisfy the first requirement of clause three: his claim is based upon the "act" of defendants' alleged non-payment of the promissory notes, which happened outside of the United States (presumably in Abu Dhabi and Bangladesh). See Pl.'s Mem. of P. & A. in Opp'n to Defs. Abu Dhabi & Khalifa's Mot. to Dismiss ("Opp'n to Abu Dhabi MTD") [ECF No. 27] at 20–21. Two questions remain: whether the notes constitute "commercial activity" and whether the failure to pay the notes caused a "direct effect" in the United States.

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). Whether an activity is commercial "shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." Id. As the Supreme Court has put it,

"the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce." Weltover, 504 U.S. at 614 (internal quotation marks omitted); see Nelson, 507 U.S. at 360 (stating that a foreign state engages in commercial activity "where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns" (internal quotation marks omitted)).  To determine whether the promissory notes at issue here constituted "commercial activity," then, this Court must examine whether they are the type of action by which a private party would engage in trade or commerce.

Friedman argues that the Supreme Court's Weltover decision is decisive and on-point, requiring that the promissory notes be considered commercial activity.  See Opp'n to Abu Dhabi MTD at 19–21.  In Weltover, the question was whether Argentina's issuance of bonds "as part of a plan to stabilize its currency" was "commercial activity."  504 U.S. at 609, 612.  The Court concluded that it was.  Id. at 614.  The Court reasoned that despite the governmental purpose of the bond issuance (which is irrelevant under the FSIA for this analysis), in nature ("i.e., the outward form of the conduct that the foreign state performs or agrees to perform") the bonds were "in almost all respects garden-variety debt instruments." Id. at 615, 617.  The Argentinian bonds could be "held by private parties" and "traded on the international market," were "negotiable," and "promise[d] a future stream of cash income." Id. at 615.  In effect, there was "nothing distinctive about the state's assumption of debt" that rendered it uniquely sovereign or non-commercial.  Id. The bond issuance was thus commercial activity.  Id.

Friedman analogizes his promissory notes to the bonds in Weltover, suggesting that the notes are "garden-variety debt instruments" and that issuing them or guaranteeing them is "exactly the kind[] of activit[y] a private party in a commercial marketplace would undertake."  Opp'n to

Abu Dhabi MTD at 21.  In response, the Abu Dhabi defendants point out that, on their face, the notes do not seem to have all the same features that led the Supreme Court to conclude that the Argentinian bonds were commercial activity, such as negotiability or the ability to be traded on the international market.  Reply Mem. in Supp. of Defs. the Gov't of Abu Dhabi, United Arab Emirates' Mot. to Dismiss ("Abu Dhabi Reply") [ECF No. 33] at 3–4.  The Abu Dhabi defendants also argue that it is difficult to assess the precise "nature" of the notes, as required by § 1603(d), given that the complaint contains no allegations explaining how the notes were issued, how many were issued, to whom they were originally assigned, or how they came into Friedman's possession. Id.

There is some force to the Abu Dhabi defendants' arguments, and the Court acknowledges that Friedman's complaint is not a model of clarity.  However, most courts have not read Weltover to be limited to its facts, as the Abu Dhabi defendants would have it, and have instead read it to stand for the broader principle that "the issuance of sovereign debt is a commercial act."  See, e.g., Phaneuf v. Republic of Indonesia, 106 F.3d 302, 307 (9th Cir. 1997); Glob. Index, Inc. v. Mkapa, 290 F. Supp. 2d 108, 112 (D.D.C. 2003) (concluding, with "no difficulty," that "Tanzanian promissory notes [are] a commercial activity").  Indeed, just a year after Weltover, the Supreme Court itself characterized the decision's holding as follows: "[b]ecause Argentina had merely dealt in the bond market in the manner of a private player, . . .  its refinancing of the bonds qualified as a commercial activity for purposes of the [FSIA] despite the apparent governmental motivation." Nelson, 507 U.S. at 361.  Moreover, Friedman's promissory notes do have several features similar—though not identical—to those the Supreme Court thought important in Weltover.  They can be held by private parties, may be "transferred, pledged[,] or assigned," and promise a lump sum future payment.  Promissory Notes at 2; cf. Turkmani v. Republic of Bolivia, 193 F. Supp. 2d

165, 175 (D.D.C. 2002) (concluding that issuance of debt instruments that "promised future interest payments and could be held, negotiated for, and traded by private parties" was commercial activity).  Most importantly, the notes have no features that are "peculiar to [the] sovereign[]"— there is "nothing about the issuance of [the notes] . . . that is not analogous to a private commercial transaction."  Weltover, 504 U.S. at 614, 616.  The Court therefore concludes that the notes are "commercial activity" and satisfy the second requirement of clause three.

Next, the Court must determine whether the promissory notes have a "direct effect" in the United States, under clause three's final requirement.  Once again, the leading Supreme Court case on the meaning of "direct effect" is Weltover.  After determining that issuance of the Argentinian bonds was commercial activity, the Weltover Court went on to examine whether Argentina's unilateral rescheduling of its payment of the bonds had a "direct effect" in the United States.  Id. at 618–19.  The Court explained that "an effect is 'direct' if it follows as an immediate consequence of the defendant's activity."  Id. at 618 (cleaned up).  And because the bond contract at issue there specified the place of performance as New York, such an immediate consequence existed: "the rescheduling of those obligations necessarily had a 'direct effect' in the United States[.]  Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming."  Id. at 619.

The D.C. Circuit, in a line of cases interpreting Weltover, has elaborated the meaning of "direct effect" still further.  In Goodman Holdings v. Rafidain Bank, 26 F.3d 1143 (D.C. Cir. 1994), the Circuit considered whether the Iraqi government's failure to honor letters of credit that it had issued to two Irish corporations had a direct effect in the United States, id. at 1144.  The panel concluded that there was no direct effect because "[n]either New York nor any other United States location was designated as the 'place of performance.'"  Id. at 1146.  It did not matter that

Iraq "might well have paid [plaintiffs] from funds in United States banks," because Iraq "might just as well have done so from accounts located outside the United States"; there was therefore no necessary "immediate consequence" of the breach in the United States.  Id. at 1146–47.  Similarly, in Peterson v. Royal Kingdom of Saudi Arabia, 416 F.3d 83 (D.C. Cir. 2005), the Circuit rejected a plaintiff's argument that an agreement by Saudi Arabia to pay him wherever he lived had a direct effect in the United States, because there was "no agreement—implied or express—that [he] was to be paid in the United States," id. at 91.  This pay-wherever-you-are arrangement did not satisfy the Weltover requirement that an effect must have an "immediate consequence" in the United States, because plaintiff's ability to move and receive payment in the location of his choice constituted an "intervening element" that severed the direct link between the agreement and the United States.  See id.

Most recently, in Odhiambo v. Republic of Kenya, the Circuit affirmed the vitality of its holdings in Goodman and Peterson and explained that in cases involving alleged breaches of contract, whether the breach has a direct effect in the United States "turn[s] on whether the contract in question establishe[s] the United States as a place of performance."  Odhiambo, 764 F.3d at 38.  "By definition," the court stated, "breaching a contract that establishes the United States as a place of performance will have a direct effect here, whereas breaching a contract that establishes a different or unspecified place of performance can affect the United States only indirectly."  Id.  Any other rule "would create an incentive for every breach of contract victim in the world to move to the United States, demand payment here, and then sue alleging a direct effect of nonpayment in the United States."  Id. at 39.  That result would "undermine Congress's objective of avoiding turning U.S. courts into small international courts of claims."  Id. (internal quotation marks omitted).  Hence, the Circuit has drawn a "very clear line: . . . breaching a contract that establishes

or necessarily contemplates the United States as a place of performance causes a direct effect in the United States, while breaching a contract that does not establish or necessarily contemplate the United States as a place of performance does not cause a direct effect in the United States." Id. at 40.

Friedman faces an uphill battle under this standard.  Nothing on the face of the promissory notes says <u>anything</u> about the place of performance—they are entirely silent on the question. Friedman even concedes that the notes do not "establish" the United States as the place of performance.  <u>See</u> Pl.'s Combined Mem. of P. & A. in Opp'n to Def. Janata Bank's Mot. to Set Aside Entry of Default & Reply in Supp. of Pl.'s Mot. for Default Judgment Against Janata Bank ("Friedman Response to Janata") [ECF No. 39] at 22 n.22.  But he nevertheless argues that the notes have a direct effect in the United States because they "necessarily contemplate[]" the United States as a place of performance.  <u>Id.</u>; <u>see</u> <u>Odhiambo</u>, 764 F.3d at 40.

To do so, he relies on the portion of the notes reading:

> The terms and conditions of this promissory note are to be governed and construed in accordance with the documentary credit instruments as approved by the International Chamber of Commerce of Paris, resolution 222, last edition 1962 for Documentary Credits and in accordance with the law of the Confederation of Switzerland and of the Canton of Geneva prevailing on the date of the issue.

Promissory Notes at 2, 4.  To explain what that provision means, Friedman has submitted an affidavit from Marco Villa, an expert on Swiss law.  <u>See</u> Ex. A to Opp'n to Abu Dhabi MTD ("Villa Decl.") [ECF No. 27-1] ¶¶ 2–3.  According to Villa, "there is no prohibition under Swiss law prevailing on May 30, 1975 denying a creditor the right to sue for payment of a defaulted debt instrument in any jurisdiction of his choice (except in Switzerland)."  <u>Id.</u> ¶ 6(a).  Friedman, armed with Villa's affidavit, argues that under Swiss law he, "as the holder of the [promissory notes], has the right to collect on them in the United States," and therefore the Abu Dhabi defendants' and

Janata Bank's "breaches of their promises under the instruments have 'direct effects' in the United States."  Opp'n to Abu Dhabi MTD at 22.

The Court does not agree that a provision giving a creditor the right to sue for enforcement of the notes anywhere in the world suffices to satisfy the "direct effect" requirement.  The Court will assume—though the Abu Dhabi defendants dispute this point[2]—that a "place where the creditor can sue to enforce a contract" provision, like the one in Friedman's promissory notes, has the same legal effect as the more common "place of performance" provision.  In other words, the Court will assume that a worldwide sue-for-enforcement provision grants the creditor (in this case, Friedman) the right to demand performance anywhere in the world, just as a worldwide place-of-performance provision would.

Nevertheless, the promissory notes here still fail the direct effect test.  As the Odhiambo court put it, "breaching a contract that establishes a[n] . . . unspecified place of performance can affect the United States only indirectly, as the result of some intervening event."  764 F.3d at 38.  The promissory notes here do not specify any specific jurisdiction as the place of performance, instead allowing performance to occur anywhere in the world.  The D.C. Circuit has repeatedly rejected these "pay wherever you are" arrangements as insufficient to create a direct effect in the United States.  See id. at 39; Peterson, 416 F.3d at 90–91 (agreement to pay workers "wherever [they] lived" did not create direct effect in United States); Goodman, 26 F.3d at 82–83 (letters of credit that did not specify a place of performance did not create direct effect in the United States); Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511, 1514 (D.C. Cir. 1988) (agreement to "forward

---

[2] They contend that a provision allowing a party to sue worldwide to enforce non-payment is an additional step removed from the United States in comparison with a worldwide place-of-performance provision, because there are two intervening elements between the breach and the United States: first, where the creditor happens to be when the breach occurs, and second, the creditor's choice of jurisdiction in which to sue.  See Abu Dhabi Reply at 7–8.  The Court sees the logic in this argument, but declines to decide the question because Friedman's direct effect argument fails even under his own view of the enforcement provision.

the money to [plaintiff] <u>wherever</u> he chose to travel" did not create direct effect in the United States).

Friedman tries to get around this clear Circuit precedent by arguing that the fact that the promissory notes specify that they will be paid out in U.S. currency mandates a different outcome. Opp'n to Abu Dhabi MTD at 25. But that mere fact, standing alone, does not show that the notes "necessarily contemplate" performance <u>in</u> the United States—the U.S. dollar is a commonly used currency the world over. <u>See</u> <u>Global Index, Inc.</u>, 290 F. Supp. 2d at 114 (rejecting argument that direct effect existed where "[t]he notes plainly require payment in U.S. dollars to a U.S. company but, on their face, do not designate <u>any</u> place of payment at all, let alone a particular bank or city in the United States").

Nor is the Court persuaded by Friedman's passing argument that because Abu Dhabi caused the notes to be delivered to his residence in the United States, non-performance of the notes thereby necessarily causes a direct effect in the United States. <u>See</u> Opp'n to Abu Dhabi MTD at 25 n.14. <u>Peterson</u> presented similar facts: Saudi Arabia had an agreement to pay plaintiff and "understood" that he would return to the United States and expect to be paid there. 416 F.3d at 90–91. Nonetheless, the D.C. Circuit concluded that there was no direct effect, because there was no actual "agreement—implied or express—that [plaintiff] was to be paid in the United States." <u>Id.</u> at 91. Instead, the contract in <u>Peterson</u> promised to pay the plaintiff wherever he was, regardless of where the parties expected that might be at the time the contract was formed. <u>Id.</u> There was thus an intervening element between the contract and the effect in the United States: the plaintiff's choice of residence. <u>See</u> <u>id.</u> Similarly here, under Swiss law, even if Friedman lived in the United States when he came into possession of the notes, he could have moved away from the United States and sued in any other jurisdiction to enforce them. His choice to remain in the United States

16

and sue here is an intervening element that severs the direct link between the notes and the United States.

In an attempt to shore up his position, Friedman calls the Court's attention to the Sixth Circuit's decision in DRFP L.L.C. v. Republica Bolivariana de Venezeula, 622 F.3d 513 (6th Cir. 2010). There, the panel considered promissory notes similar in some respects to those at issue here; in particular, the notes were also governed by Swiss law, such that "the bearer of the notes may sue for collection in the jurisdiction of his choice." Id. at 516. The panel divided over the question whether non-payment of the notes had a direct effect in the United States. The majority determined that they did have a direct effect in the United States. Id. at 517. In the majority's view, the direct effect requirement was satisfied because "the parties implicitly agreed to leave it to the bearer to demand payment of the notes anywhere," including within the United States. Id. The dissent disagreed that this was sufficient to satisfy Weltover, concluding that "[t]he effect on the United States [was] not direct because it [was] not an immediate consequence of the defendant's activity"; instead, "it was a consequence of [plaintiff's] choice of the United States." Id. at 523 (Martin, Jr., J., concurring in part and dissenting in part). The dissent thought it "incredible that a country issuing notes would, under any circumstances, waive its sovereign immunity in every country in the world in which a noteholder could take the notes and [sue for enforcement]." Id.

This Court is inclined to think that the DRFP dissent had the better of that argument. But whatever the merits of the DRFP majority's reasoning, the decision is clearly in conflict with this Circuit's precedents. Indeed, in Odhiambo, in a partial dissent, Judge Pillard expressly distinguished the D.C. Circuit's approach from that taken in DRFP, noting that "the majority opinion's narrowing approach to our FSIA direct-effects precedent, which requires a U.S. place-

of-performance clause, conflicts with" the DRFP decision. Odhiambo, 764 F.3d at 47 (Pillard, J., concurring in part and dissenting in part). Friedman cannot, therefore, rely on DRFP to get around binding D.C. Circuit precedent culminating in Odhiambo.

That precedent dictates that Friedman's promissory notes have, at best, an indirect effect in the United States. As a result, this Court concludes that Friedman has not met his burden of production to show that clause three of the FSIA's commercial activity exception applies to his breach of contract claim. See Owens, 864 F.3d at 784. With respect to that claim, he has therefore failed under Rule 12(b)(1) to establish jurisdiction against Abu Dhabi or Khalifa and under 28 U.S.C. § 1608(e) to establish jurisdiction against Janata Bank by evidence satisfactory to the Court. The Court will dismiss the breach of contract claim for lack of subject-matter jurisdiction.[3]

### b. Equitable Claims Against Abu Dhabi

In the alternative to his breach of contract claim, Friedman brings equitable claims of quantum meruit (contract implied-in-fact) and unjust enrichment against only Abu Dhabi. See Compl. ¶¶ 109–17. For these claims, Friedman invokes clause one of the commercial activity exception as the basis for subject-matter jurisdiction. See Opp'n to Abu Dhabi MTD at 26. Clause one requires Friedman to establish that his equitable claims are "based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). Friedman identifies two potential activities of Abu Dhabi within the United States that would satisfy clause one: (1) Abu Dhabi's "causation of the delivery of the [promissory notes] to Mr. Friedman at his then-residence in Alexandria, Virginia"; and (2) "the meetings and discussions Abu Dhabi had with him

---

[3] Because the Court lacks subject-matter jurisdiction over Janata Bank, it will also set aside the Clerk's entry of default against Janata Bank. See Strange, 320 F. Supp. 3d at 99; see also Khochinsky v. Republic of Poland, 2019 WL 5789740, at *4 (D.D.C. Nov. 6, 2019).

in Washington, D.C. to negotiate his provision of advisory services on behalf of the Emirate."[4]

Opp'n to Abu Dhabi MTD at 26–27.[5]   The first activity does not satisfy clause one, but the second

does.

As to the delivery of the promissory notes to Friedman, this activity fails to meet the first

requirement of clause one: that the claims be "based upon the aspect of the foreign state's

commercial activity that establishes substantial contact with the United States."   Odhiambo, 764

F.3d at 37 (emphasis omitted); see Nelson, 507 U.S. at 356–58.   In this context, "based upon"

means "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory

of the case."   Nelson, 507 U.S. at 357.   In other words, a claim is based upon the "core of the suit":

the "particular conduct that constitutes the gravamen of the suit."   OBB Personenverkehr AG v.

Sachs, 136 S. Ct. 390, 396 (2015) (internal quotation marks omitted).   If the activity that a plaintiff

alleges established substantial contact with the United States "is not necessary to make out any

element of" his or her claim, then the claim is not "based upon" that activity.   Odhiambo, 764 F.3d

at 37.   Here, the fact that Abu Dhabi caused the notes to be delivered to Friedman's Alexandria

---

[4] Friedman's filings in this case regularly refer interchangeably—and confusingly—to the UAE and the Government of Abu Dhabi.   For instance, at one point in his complaint, Friedman states that "Abu Dhabi approached [him] about enlisting his assistance to help establish the requisite political relationships between the UAE and the United States."   Compl. ¶ 19.   But in the next paragraph, when elaborating on that approach, Friedman states that "[s]pecifically, then-UAE Embassy official Hamad Al Madfa invited Mr. Friedman to attend meetings at the UAE Embassy in Washington, D.C."   Id. (emphasis added).   Given that they are not the same entity (the UAE encompasses but is separate from Abu Dhabi, much like the United States encompasses but is separate from Massachusetts), this consistent error is potentially problematic for some of Friedman's claims.   For example, his complaint does not specifically allege that any Abu Dhabi officials attended the business meetings in Washington, D.C. that he uses as the basis for his argument that the commercial activity exception applies to his equitable claims—he refers only to UAE officials.   Id. ¶¶ 20–23.   However, given the interchangeability of Friedman's references to UAE and Abu Dhabi throughout the complaint, the Court will assume for now that some Abu Dhabi officials attended those meetings.

[5] Friedman does not press his alleged joint venture with Abu Dhabi as a basis for subject-matter jurisdiction. See Opp'n to Abu Dhabi MTD at 26 (calling it a "gross mischaracterization" of his claims to argue that "[t]he commercial activities of Abu Dhabi upon which Mr. Friedman's claims are based are . . . any commercial relationship between Mr. Friedman and [Abu Dhabi] with respect to the joint venture Mr. Friedman helped to establish in the UAE").

residence is not necessary to make out any element of his quantum meruit or unjust enrichment claims.[6]  This is fatal to his argument that his equitable claims are "based upon" that activity.

Friedman has better luck with his second argument, relating to his meetings with Abu Dhabi, though the Court frames his point slightly differently than he has.  As it must, the Court begins by identifying the specific conduct upon which Friedman's equitable claims are based, or the "core" or "gravamen" of the suit.  See Sachs, 136 S. Ct. at 396; Jam v. Int'l Finance Corp., 2020 WL 759199, at *8 (D.D.C. Feb. 14, 2020) (explaining that courts should take a "holistic" approach to identify the gravamen).  In similar cases, involving breach of contract or related equitable claims, courts routinely identify the breach (or formation plus breach) as the gravamen. See, e.g., Petersen Energia Inversora S.A.U. v. Argentine Republic & YPF S.A., 895 F.3d 194, 207 (2d Cir. 2018) ("[W]e conclude that [plaintiff's] lawsuit is 'based on' Argentina's breach of a commercial obligation."); Devengoechea v. Bolivarian Republic of Venezuela, 889 F.3d 1213, 1223 (11th Cir. 2018) ("The conduct that actually injured [plaintiff]—and therefore makes up the gravamen of [his] lawsuit—is Venezuela's failure to return [artwork] to [plaintiff] or to pay him for it."); Lempert v. Republic of Kazakhstan, 62 F. App'x 355, 355 (D.C. Cir. 2003) ("[T]his action is based on the formation and alleged breach of the consulting agreement.").  So too here.  The gravamen of Friedman's equitable claims is that Abu Dhabi broke its promise, made during its meetings with Friedman, to pay him in exchange for valuable services rendered in the United States.  See Compl. ¶¶ 110–11, 115–16.  That conduct is "at [the] foundation" of Friedman's

---

[6] The elements of an unjust enrichment claim are: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." News World Commc'ns, Inc. v. Thompsen, 878 A.2d 1218, 1222 (D.C. 2005).  The elements of a quantum meruit claim are: "(1) valuable services must be rendered [by the plaintiff]; (2) for the person sought to be charged; (3) which services were accepted by the person sought to be charged, and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, expected to be paid."  Brown v. Brown, 524 A.2d 1184, 1190 (D.C. 1987) (quotation omitted).

equitable claims, <u>Sachs</u>, 136 S. Ct. at 396, and "provides the legal basis" for the claims, <u>Merlini v.</u> <u>Canada</u>, 926 F.3d 21, 30 (1st Cir. 2019).

The next question is whether Abu Dhabi's failure to pay Friedman has "substantial contacts" with the United States, as required by the FSIA.  28 U.S.C. § 1603(e).  The Court easily concludes that it does.  As alleged, Abu Dhabi's promise to pay, as well as the services Friedman provided, all occurred in the United States—specifically, in Washington, D.C.  <u>See</u> Compl. ¶¶ 19– 21.  All of the meetings held between Friedman and Abu Dhabi likewise took place in Washington, D.C.  <u>Id.</u>  These alleged contacts satisfy the FSIA's requirements.  <u>Cf.</u> <u>Lanny J. Davis & Assocs.</u> <u>LLC v. Republic of Equatorial Guinea</u>, 962 F. Supp. 2d 152, 159 (D.D.C. 2013) (concluding substantial-contact requirement was met in case involving breach of contract where "the majority of [plaintiff's] work was performed here in Washington, D.C." and foreign sovereign had participated in many meetings in the United States); <u>Tonoga, Ltd. v. Ministry of Public Works &</u> <u>Housing of Kingdom of Saudi Arabia</u>, 135 F. Supp. 2d 350, 356–57 (N.D.N.Y. 2001) ("[W]hen the commercial activity in question centers on the formation of a contract, the United States will be found to have had a substantial contact with that activity if substantial aspects of the contract were to be performed here." (internal quotation marks and ellipses omitted)); <u>see</u> <u>Lempert v.</u> <u>Republic of Kazakhstan</u>, 223 F. Supp. 2d 200, 203 (D.D.C. 2002), <u>aff'd</u> 62 F. App'x 355 (D.C. Cir. 2003) (suggesting that substantial-contacts requirement would be met where "there were . . . meetings between the parties in the United States, . . . significant availment of resources in this country to persuade [plaintiff] to enter into the contract, and . . . regular recruitment efforts here").

Abu Dhabi, citing <u>Odhiambo</u>, argues that "mere business meetings" cannot satisfy the substantial-contact requirement.  <u>See</u> <u>Odhiambo</u>, 764 F.3d at 36–37.  But Abu Dhabi pulls this statement out of context.  In <u>Odhiambo</u>, the meetings were not sufficiently related to the gravamen

of plaintiff's suit.  See id. at 37 (noting that plaintiff's "meetings with Kenyan officials in the United States . . . [were] not necessary to make out any element of his breach-of-contract claim").  Odhiambo was not articulating a per se rule that business meetings can never constitute substantial contacts with the United States; indeed, the Circuit's precedent makes clear that the analysis will always depend on what role the meetings played in the full context of a given plaintiff's claims.  Compare Zedan, 849 F.2d at 1513 (concluding that a "recruitment phone call, in which no contract [was] agreed upon," cannot satisfy substantial-contact requirement); Maritime Int'l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1109 (D.C. Cir. 1982) (concluding that "two isolated meetings amounted to [no] more than 'transitory' and 'insubstantial' contact for purposes of the [FSIA]"), with Zedan, 849 F.2d at 1513 (suggesting that entering into a contractual agreement at a meeting, "one part of which is to be performed in the United States," would constitute substantial contacts with the United States).  Here, Friedman alleges that at the meetings with Abu Dhabi, he entered into a contract-in-fact to perform services in the United States or negotiated the terms of an arrangement to perform those services that later unjustly enriched Abu Dhabi to his detriment.  See Compl. ¶¶ 21, 110–11, 115–16.  Under the logic of Zedan, these meetings constitute "substantial contacts with the United States."

Finally, Abu Dhabi's promise to pay, and subsequent failure to pay, was "commercial activity."  As before, the inquiry is whether the actions at issue "are the types of actions by which a private party engages in trade and traffic or commerce."  Weltover, 504 U.S. at 614 (internal quotation marks omitted).  Friedman argues that the meetings at which Abu Dhabi promised to pay him for his services were "the kind of negotiations in which private commercial parties routinely engage."  Opp'n to Abu Dhabi MTD at 27.  In response, Abu Dhabi argues that the meetings were not commercial because they were meetings "undertaken to further a nation's

foreign policy and defense strategies."   Abu Dhabi Reply at 13.   However, this argument impermissibly "describe[es] the act in question as intertwined with its purpose."   Cicippio v. Islamic Republic of Iran, 30 F.3d 164, 167 (D.C. Cir. 1994).   The Court is prohibited by statute from looking at the motive behind the activity—instead, it must look at the nature of the activity. See 28 U.S.C. § 1603(d).

Here, Abu Dhabi simply retained Friedman to lobby the U.S. government to advance its interests in exchange for payment.   This is no different in nature from a private entity hiring a lobbyist to represent its interests, as happens every day in Washington and elsewhere.   See Kettey v. Saudi Ministry of Educ., 53 F. Supp. 3d 40, 50 (D.D.C. 2014) ("Contracts for services are generally considered commercial activities when entered into in the United States."); cf. Dentons US LLP v. Republic of Guinea, 410 F. Supp. 3d 194, 205 (D.D.C. 2019) ("Contracting for the provision of legal services constitutes commercial activity." (cleaned up)).   There is nothing distinctively sovereign about the nature of this activity, even if its ultimate purpose was sovereign. See Dentons, 410 F. Supp. 3d at 205 ("It does not matter why the foreign government retained counsel or whether the foreign government's ultimate objective in retaining counsel was to further a sovereign interest."); Eckert Intern., Inc. v. Gov't of Sovereign Dem. Republic of Fiji, 834 F. Supp. 167, 171 (E.D.V.A. 1993) (rejecting argument that consulting contract was made a sovereign activity by the fact that the consultant "represented Fiji in its political and diplomatic relationship with the United States" because the argument "mistakenly focuse[d] on the contract's purpose, while ignoring its essentially commercial nature" (internal quotation marks omitted)).[7]

---

[7] Abu Dhabi cites Kato v. Ishihara, 360 F.3d 106 (2d Cir. 2004), for the proposition that "actions that [are] only superficially similar to actions typically undertaken by private parties" are not commercial activity, id. at 111; see Abu Dhabi Reply at 12–13.  But that case is not on point.  There, plaintiff worked for the Japanese government in the United States, where her duties included "product promotion for Japanese companies, general business development assistance, [and] participation in trade shows" to promote Japanese businesses.  Kato, 360 F.3d at 111–12.  When she attempted to sue Japan in an employment action, Japan raised the FSIA as a defense.  Id.  The Kato court concluded that plaintiff's suit was barred because the Japanese government had not engaged in "commercial

Friedman has established that Abu Dhabi's failure to pay for Friedman's services satisfies clause one.  The Court therefore concludes that the FSIA's commercial activity exception applies to his equitable claims, providing the Court with subject-matter jurisdiction over those claims.

## II.    Statute of Limitations

Having overcome the hurdle of subject-matter jurisdiction with respect to his equitable claims against Abu Dhabi, Friedman is now confronted with an equally formidable obstacle: the D.C. statute of limitations for quantum meruit and unjust enrichment claims.[8]  Abu Dhabi raises the statute of limitations as an affirmative defense in its 12(b)(6) motion to dismiss, as is permitted when "the facts that give rise to the defense are clear from the face of the complaint."  Abu Dhabi MTD at 20 (quoting Thompson v. HSBC Bank, 850 F. Supp. 2d 269, 273 (D.D.C. 2013)).  Courts should dismiss claims on statute-of-limitations grounds "only if the [claim] on its face is conclusively time-barred."  Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996); see United States ex rel. Landis v. Tailwind Sports Corp., 51 F. Supp. 3d 9, 38 (D.D.C. 2014) ("[A] district court can certainly grant a motion to dismiss on statute of limitations grounds, but to do so, the factual allegations in the complaint must clearly demonstrate all elements of the statute of limitations defense and that the plaintiff has no viable response to the defense.").

In D.C., "a quantum meruit or unjust enrichment claim accrues and the statute of limitations begins to run 'when the plaintiff's last service has been rendered and compensation has been wrongly withheld.'"  Glenn v. Fay, 281 F. Supp. 3d 130, 136 (D.D.C. 2017) (quoting News World Commc'ns v. Thompsen, 878 A.2d 1218, 1219 (D.C. 2005)).  Friedman's complaint does not state

---

activity" by hiring her as a government employee: instead, "promotion abroad of the commerce of domestic firms is a basic—even quintessential—governmental function."  Id.  Here, on the other hand, Abu Dhabi entered into an essentially standard lobbying agreement with Friedman, a contractor.  This action was not just "superficially similar" to the types of actions a private party would take—it was identical to those types of actions.

[8] "When jurisdiction arises under the FSIA, the local forum's statute of limitations applies to the action."  Sea Search Armada v. Republic of Columbia, 821 F. Supp. 2d 268, 272 (D.D.C. 2011) (citing Gilson v. Republic of Ireland, 682 F.2d 1022, 1025 n.7 (D.C. Cir. 1982)).

the exact dates of his service to Abu Dhabi, but it does allege that the promissory notes were delivered to him <u>after</u> his services had been completed, and at some point before November 3, 1986, the first specific date mentioned in the complaint, when Friedman began taking concrete steps to collect on the notes.  <u>See</u> Compl. ¶¶ 27, 43.  The Court will therefore treat November 3, 1986, as the date that Friedman's last service was rendered.  As for the date that compensation was wrongly withheld, Friedman alleges that he received notice on December 6, 1986, that Abu Dhabi disclaimed any knowledge of the promissory notes and refused to pay.  <u>Id.</u> ¶ 47.  To the extent that Friedman might claim that the refusal was not yet unequivocal on that date, it certainly was by October 7, 1987, when he received a letter from Abu Dhabi "affirmatively representing" that the promissory notes were "fakes" and "forgeries" and that it refused to pay them.  <u>Id.</u> ¶¶ 50–56.  Both requirements for his claims to accrue were thus satisfied not later than October 7, 1987, and that is the date on which the Court will treat his claims as having accrued.

Thirty-two years and about seven months have passed since October 7, 1987.  The applicable statute of limitations for Friedman's quantum meruit and unjust enrichment is three years.[9]  <u>See</u> <u>Boyd v. Kilpatrick Townsend & Stockton</u>, 164 A.3d 72, 75 (D.C. 2017); <u>see also</u> D.C. Code § 12-301(8) (statute of limitations for actions not otherwise specially prescribed is three years).  Absent any tolling of the statute, Friedman's claims are self-evidently time-barred.

The Court's analysis cannot stop there, however, because Friedman argues that the doctrine of fraudulent concealment applies to toll the statute of limitations here.  <u>See</u> Opp'n to Abu Dhabi MTD at 31.  Under that doctrine, "affirmative acts employed by a party to fraudulently conceal either the existence of a claim or facts forming the basis of a cause of action toll the running of

---

[9] Friedman concedes that D.C.'s 12-year statute of limitations for instruments executed under seal would be applicable, if at all, only to his breach of contract claim.  <u>See</u> Opp'n to Abu Dhabi MTD at 30–31.  It is not relevant to his equitable claims.

limitations periods." Drake v. McNair, 993 A.2d 607, 619 (D.C. 2010).  To successfully plead fraudulent concealment under D.C. law, a plaintiff must show (1) that the defendant undertook "something of an affirmative nature designed to prevent discovery of a cause of action"; and (2) that the plaintiff "by reasonable diligence could not discover the concealed facts." Earle v. District of Columbia, 707 F.3d 299, 309 (D.C. Cir. 2012).  If a plaintiff successfully pleads fraudulent concealment, "the statute of limitations is tolled until the facts are revealed." Id.

Friedman's basic argument is that Abu Dhabi's consistent statements to him (and those he enlisted to help him collect on the promissory notes) that the notes were fake and fraudulent "caused him to believe that the [promissory notes] were invalid and that bringing an action against Defendants to enforce them would be futile."  Opp'n to Abu Dhabi MTD at 32.  In Friedman's view, it would be inappropriate to decide whether the fraudulent concealment doctrine applies to his claims on a motion to dismiss because the issue involves many "contested questions of fact," such as whether and when Friedman believed Abu Dhabi's representations that the notes were fraudulent, whether and when Friedman learned that Abu Dhabi had been misleading him, what impact the newly discovered notes had on Friedman, and whether by reasonable diligence he could have discovered those additional notes earlier.  See id. at 35–38.  Fair enough.  And if Friedman's breach of contract claim had not been barred by sovereign immunity, the Court might have concluded that the fact-intensive nature of the fraudulent concealment question was such that it should not be decided on a motion to dismiss.

The problem for Friedman is that none of his allegations regarding Abu Dhabi's alleged attempt to fraudulently conceal the validity of the notes are at all relevant to his equitable claims. Neither of those claims depends on the validity of the promissory notes.  His breach of contract claim did: his claim there was that by virtue of being assigned the promissory notes, he had entered

into a contract with Abu Dhabi.  Compl. ¶¶ 105–06.  The alleged contract was therefore based on his status as a valid assignee of the notes, not on any services he had performed for Abu Dhabi. For that claim, fraudulent concealment could potentially be applicable, because if the notes were invalid (as Friedman alleges Abu Dhabi told him they were), Friedman would have no breach of contract claim.

In contrast, his equitable claims do not rely on the validity of the notes at all.  Those claims, in essence, are that he provided services to Abu Dhabi for which he was never paid.  See Compl. ¶¶ 110–12, 115–16.  The only relevance of the notes to his equitable claims is that they were allegedly to be the payment for his services.  But the allegations in the complaint demonstrate conclusively that he learned of Abu Dhabi's refusal to pay him for his services by, at the latest, October 7, 1987.  Id. ¶¶ 50–56; see Riddell v. Riddell Washington Corp., 866 F.2d 1480, 1494 (D.C. Cir. 1989) ("Clearly, the doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim." (internal quotation marks omitted)).  Under D.C. law, his equitable claims accrued at that point, and nothing that he alleges Abu Dhabi stated thereafter with respect to the validity of the notes could have any effect on those equitable claims.

Aside from the allegations regarding the notes, Friedman has made no argument whatsoever that Abu Dhabi affirmatively did anything to make him believe that he was not entitled to payment for his services and thereby prevent discovery of his equitable causes of actions, as would be required for the fraudulent concealment doctrine to apply to his equitable claims.  Indeed, his complaint repeatedly emphasizes the opposite: that Abu Dhabi and UAE officials told him that he was entitled to, and would be given, payment for his services.  See Compl. ¶¶ 21 ("Abu Dhabi agreed to provide Mr. Friedman good and valuable consideration in exchange for his services."),

26 ("[C]ertain decisionmakers of the UAE recognized Mr. Friedman's extraordinary service."), 27 ("In consideration for his extraordinary services, Abu Dhabi caused to be delivered to Mr. Friedman [the promissory notes].").  His argument that fraudulent concealment is a "rejoinder to [Abu Dhabi's] affirmative defense" of statute of limitations, then, is "foreclosed by the allegations in the complaint."  de Csepel v. Republic of Hungary, 714 F.3d 591, 608 (D.C. Cir. 2013).

Friedman has "no viable response" to Abu Dhabi's statute of limitations defense.  Landis, 51 F. Supp. 3d at 38.  The Court will therefore dismiss his equitable claims as conclusively time-barred.  Cf. Nader v. Democratic National Committee, 567 F.3d 692, 699–702 (D.C. Cir. 2009) (affirming dismissal on statute of limitations grounds where uncontested allegations clearly showed not only when cause of action arose, but also that fraudulent concealment could not apply).  Thirty-two years is simply too long to wait to file suit on claims that Friedman has known about all along, given Abu Dhabi's consistent refusal to pay over that entire period.

## Conclusion

 For the foregoing reasons, the Court concludes that (1) it lacks subject-matter jurisdiction over Friedman's breach of contract claim against Abu Dhabi, Khalifa, and Janata Bank; (2) it has subject-matter jurisdiction over Friedman's equitable claims against Abu Dhabi; and (3) the equitable claims are time-barred.  Accordingly, the Court will set aside the entry of default against Janata Bank, dismiss the breach of contract claim for lack of subject-matter jurisdiction, and dismiss Friedman's equitable claims as time-barred.  A separate order has been issued on this date.

/s/

JOHN D. BATES
United States District Judge

Dated: May 14, 2020